UNITED STATES of America, Appellee,

v.

**Patrick John GALLAGHER, Appellant.**

**No. 76–2347.**

United States Court of Appeals, Fourth Circuit.

Submitted May 3, 1977.

Decided June 24, 1977.

knowingly and intentionally importing hashish, 21 U.S.C. § 952(a), and (2) possessing hashish with intent to distribute, 21 U.S.C. § 841(a)(1). Convicted on charge (1) in the first count of the indictment, Gallagher was sentenced to a three and one-half year prison term. He now appeals the conviction, urging that it is tainted by the admission of illegally seized evidence.

On June 3, 1974, the SS Silur, a German ship, docked at the port of Baltimore, having sailed from Lisbon, Portugal. Among the items of cargo carried by the SS Silur was a Volkswagen camper shipped by Patrick Philip Gallagher and consigned to him at the port of Norfolk, Virginia.[1]

The Volkswagen camper was unloaded from the ship at Baltimore and was parked in a security area at the pier. On June 7, the camper was loaded into the trailer of a tractor-trailer truck owned and operated by the Norfolk, Baltimore and Carolina Line. The driver of the truck drove the truck and its contents to United States Customs and received an Immediate Transportation permit—a document which allows goods to enter the physical boundaries of the United States and be shipped to their final destination under the custody of the United States Customs.[2] A customs official inventoried the merchandise in the trailer and then put an official numbered seal through the trailer's door latch so that the door could not be opened without breaking the seal. The seal also indicates that the cargo inside is under United States Customs custody.

The sealed trailer was sent to Norfolk and it arrived at the United States Customs office at Lambert's Point in Norfolk on June 11, 1974. The next day, a customs inspector checked the trailer to see if the seal was still intact. After determining·

J. Frederick Sinclair, Asst. U. S. Atty., Alexandria, Va., for appellee.

Michael S. Shelton, Richmond, Va., for appellant.

Before BOREMAN, Senior Circuit Judge, and WINTER and WIDENER, Circuit Judges.

PER CURIAM:

Patrick John Gallagher was tried before a jury on February 13, 1975, on charges of (1)

---

1. The camper was shipped in the name of Patrick *Phillip* Gallagher. Upon questioning by a customs official, the appellant, Patrick *John* Gallagher, explained that the name on the shipping invoice was a combination of his own name and that of his brother, *Phillip* Lee Gallagher. He stated that he and his brother intended to register the camper under both their names in Illinois.

2. The Norfolk, Baltimore and Carolina Line is a bonded shipping company, liable to customs if anything should happen to the cargo entrusted to its care. Customs continues custody of the goods via the shipping line.

that the seal had not been disturbed and had the same number as recorded on the accompanying papers, the inspector broke the seal and allowed the trailer to be unloaded. The Volkswagen camper was immediately placed in the customs security warehouse.

On June 12, 1974, Patrick John Gallagher came to the customs office at Lambert's Point to claim the Volkswagen camper. He presented a shipping notice and a customs officer went down to the warehouse to give the vehicle a preliminary examination for safety stickers and pollution controls. Because of the size of the camper, its new-looking interior paneling, and the infrequency of shipments of vehicles to Lambert's Point, the customs official decided to conduct a more extensive search of the vehicle. The official returned to the office, told Gallagher to come back later for the camper, and then ran Gallagher's name through the Treasury Enforcement Computer System (TECS). He learned from this source that Gallagher had previously been arrested abroad for the possession of drugs.

Their suspicions having been aroused, customs inspectors thoroughly searched the camper, removing headlights, tail lights, all lamps, the interior paneling and the section in front of the engine. The back seat was removed, exposing several holes into the gas tank area. A screwdriver was inserted into one of these holes and it struck a hard substance. When the screwdriver was removed there was a residue on its tip. The inspectors then tested the substance with a drug analysis field kit and found the reaction was positive to a hashish derivative.

At that time, a dog trained to sniff narcotics was brought to the scene. The animal reacted when brought close to the holes in the camper by becoming excited and barking. The customs agents then decided to pry open the metal panel in front of the gas tank area, at which point they discovered approximately 95 pounds of tetrahydrocannabinols, commonly known as hashish. The hashish was then removed, and the camper was reassembled.

Mr. Gallagher arrived the next morning, and after signing several papers and paying the customs fees, he drove the car through the customs gate. At that point, Mr. Gallagher was placed under arrest and taken into custody. The camper was seized by the officers.

The authority of customs inspectors to perform a border search derives from statute, 19 U.S.C. § 482, which empowers them to "stop, search, and examine, as well without as within their respective districts, any vehicle . . . on which . . . they shall suspect there is merchandise which . . . shall have been introduced into the United States in any manner contrary to law . . . ." If such a search produces contraband items, the customs officer "shall seize and secure the same for trial." *Id.*

The above-quoted passage reflects the long-recognized distinction between border searches and those taking place in interior locations. "Travellers may be . . . stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). "[S]earches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well." *Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). At points other than the border or its functional equivalent, however, officers may not search private vehicles absent consent or probable cause. *United States v. Ortiz,* 422 U.S. 891, 896–97, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

Gallagher does not contest the theoretical power of the United States to conduct border searches. Rather, he claims that upon the unique circumstances of this case—*i. e.,* where the vehicle entered the country at one point but was not searched until its arrival several days later at a second mainland situs—customs officials could not in-

voke their statutory authority to conduct border searches in order to avoid the otherwise applicable more stringent requirements of the Fourth Amendment.[3]

■ Because we conclude that Norfolk was the border for purposes of § 482, we need not grapple with *defining* the concept of the "functional equivalent" of the border. Nor can we accept the view urged by Gallagher. The Volkswagen camper was sent under bond from Lisbon *to Norfolk* via Baltimore; its intended destination *was Norfolk*. Although the camper was physically within the territorial confines of the United States, it never left the official custody of United States Customs. The trailer in which the camper was transported from Baltimore to Norfolk was not tampered with. Thus, when the camper arrived at Norfolk, it stood at the border for purposes of § 482. *Cf. United States v. King,* 517 F.2d 350 (5 Cir. 1975).

■ Gallagher claims that resentencing is required for the reason that the district judge failed to *properly* consider sentencing under the Youth Corrections Act, 18 U.S.C. § 5010. In contending for vacation of sentence, Gallagher misconstrues the thrust of our decision in *United States v. Ingram,* 530 F.2d 602 (4 Cir. 1976). *Ingram* decries the denial of Youth Corrections Act sentencing where the sole factor relied upon in such denial is the crime committed. In *Ingram,* the sentencing judge stated that he would never sentence an armed bank robber under the Youth Corrections Act; this constituted a failure to exercise discretion and an abdication of the responsibility to individualize sentencing.

The instant case stands on a vastly different footing. Here the presiding judge stated:

while the law involving *young adult offenders* might apply, because you were not 26 at the time of the actual conviction in February, 1974, nevertheless in my judgment, having considered your record and the record of your involvement as revealed in the pre-sentence report, and the degree of involvement in this case, which was some nearly 100 pounds of hashish, and as I remember had a street value, at least in some estimation, of $300,000 or $400,000. For those reasons I do not find the Youth Correction[s] Act would be appropriate for any incarceration *in your case.* (Emphasis added)

It is clear that the district judge considered the possible application of the Young Adult Offenders Act, 18 U.S.C. § 4209, *see Brown v. United States,* 547 F.2d 821 (4 Cir. 1977), and exercised his discretion in rejecting this sentencing alternative. His sentencing decision was based upon Gallagher's prior record as revealed by the presentence report and was not based merely upon the nature of the crime committed in the instant case. Because the district judge did, indeed, exercise his discretion, we will not scrutinize it further. *United States v. Noland,* 510 F.2d 1093 (4 Cir. 1975); *United States v. Williams,* 407 F.2d 940 (4 Cir. 1969).

Accordingly, we dispense with oral argument and affirm the judgment of the district court.

*Affirmed.*

---

3. Although § 482 requires that the customs officer act only upon a "reasonable cause to suspect," it has been held widely that such a requirement is less stringent than the Fourth Amendment's standard "probable cause" requirement. *See, e. g., United States v. Doe,* 472 F.2d 982 (2 Cir.), *cert. denied sub nom. Rodriquez v. United States,* 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (1973). Apparently, Gallagher does *not* contest that Norfolk customs officials did possess "reasonable cause to suspect."